IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| vs. | : | |
| | : | |
| AKEEM JOSEPH, | : | |
| a/k/a "AKEEM OLAJUWON" | : | NO.  09-673 |

**GENE E.K. PRATTER, J.**                                                              **MARCH 13, 2012**

## MEMORANDUM

### INTRODUCTION

Akeem Joseph has been indicted for passing two counterfeit $100 Federal Reserve Notes and possessing $1400 in counterfeit Notes, all in violation of 18 U.S.C. § 472.  The charges arise from events described in detail below.

Mr. Joseph contends that the conduct of the law enforcement officers in connection with those events, to wit, an allegedly improper search and improper interrogations, merits suppression of the counterfeit bills and other physical evidence as well as of the statements Mr. Joseph made to the law enforcement officers.  The Government opposes the suppression motion.

Following an evidentiary hearing held on March 6, 2012 at which University of Pennsylvania Police Officers Julia Umbrell and James Morrison and Secret Service Special Agent Kristi Taylor testified and various relevant exhibits were received, the Court concludes that Mr. Joseph's Fourth, Fifth and Sixth Amendments rights were not violated, and, accordingly, his suppression motion should be denied.

**FACTUAL BACKGROUND**

University of Pennsylvania Police Officer Julia Umbrell was on duty in her patrol car in the very early morning hours of October 16, 2008 in the vicinity of the Penn campus at 38th and Chestnut Streets in West Philadelphia when she was flagged over by security personnel at the Atlantis Night Club.  (3/6/12 N.T. 6).  Officer Umbrell (who had 10 years' law enforcement experience on the Penn and Philadelphia police forces) was informed by the Atlantis security guard that a male patron of the Club, according to the Atlantis bartender, had passed counterfeit money in the Club.  (3/6/12 N.T. 6-7).  While awaiting the bartender, Officer Umbrell looked at the subject $100 bills, made inquiry to the patron at issue (defendant Akeem Joseph) who was available outside of the Club and requested identification from Mr. Joseph.  Mr. Joseph said he had been in the Club and had given the money to the Club personnel.  In response to the request for identification he proffered a passport, described by Officer Umbrell as having a ripped picture, making the I.D. seem to her to be "somewhat altered."  (3/6/12 N.T. 7-8).  At this point, Mr. Joseph had not been patted down, searched or otherwise restrained in any way.  In her words, Officer Umbrell was trying to determine "what was going on; if a crime had even occurred."  (3/6/12 N.T. 8).  Soon thereafter the "bartender came up and stated that [Mr. Joseph] was the male who gave her counterfeit money."  (3/6/12 N.T. 9).

While this activity was going on, at least one other Penn police officer arrived on the scene, Officer James Morrison.  (3/6/12 N.T. 9, 70-71). Officer Morrison was also an experienced law enforcement officer, having served on the Philadelphia Housing Authority force for 13 years before joining the Penn police department.  When Officer Morrison arrived on the scene, he saw Officer Umbrell talking with two people while Mr. Joseph was standing to the side, about one or

2

two feet in front of a brick wall.  Mr. Joseph was not then restrained.  (3/6/12 N.T. 70-72).  Officer Morrison, using a flashlight, looked at one of the bills in question and "it looked like something was wrong with it" because "the ink mark didn't match up with the picture of the president that was on it."  (3/6/12 N.T. 73-74).

Once the bartender confirmed to Officer Umbrell that Mr. Joseph was the individual who had tendered the suspicious notes, Mr. Joseph was placed under arrest.  This was approximately five minutes after Officer Umbrell had arrived on the scene.  The Officer then searched Mr. Joseph and found 14 $100 bills in Mr. Joseph's left front pocket, as well as a cell phone.  (3/6/12 N.T. 9-10).  Mr. Joseph was then turned over to the police "wagon crew" for a further standard officer-safety search prior to his transport to Southwest Detectives station where a summoned Secret Service agent, Special Agent Kristi Taylor, met with Officer Umbrell and her supervisor, interacted with Mr. Joseph and examined the recovered bills.  (3/6/12 N.T. 10).

Special Agent Taylor, now in her eighth year with the Secret Service, came to the Southwest Detectives station after receiving an official notification at approximately 1:15 a.m. on October 16 that she was to come to the station.  She arrived at the station at some point between 2 a.m. and 3 a.m. and received a briefing from Officers Umbrell and Morrison as well as a Detective Callas.  Special Agent Taylor requested to see the currency at issue to determine whether the notes were counterfeit.  She determined that they were.  (3/6/12 N.T. 23-24).  According to Special Agent Taylor, she was not told of anything Mr. Joseph said or allegedly said to the Penn police officers.

After examining the currency, Ms. Taylor interviewed Mr. Joseph herself in the station's holding area, starting first by reading verbatim to Mr. Joseph "his Miranda [rights]" from a pre-

printed Secret Service form designed for this purpose. (3/6/12 N.T. 25-27). Mr. Joseph signed this form at approximately 3:39 a.m. (Govt. Ex. 1), acknowledging that he understood and waived his rights and agreed to talk to the Secret Service officer. (3/6/12 N.T. 28-29). Mr. Joseph proceeded to speak with Special Agent Taylor, first telling her one, then another and still other stories as to where he acquired the counterfeit money. Special Agent Taylor asked Mr. Joseph if he had a cell phone and, if so, could she look at it. Mr. Joseph agreed. Again using a pre-printed Secret Service consent-to-search form, Special Agent Taylor presented that form to Mr. Joseph who signed it (Govt. Ex. 2). (3/6/12 N.T. 31). Mr. Joseph volunteered (and personally entered) the pass code for his phone to provide access to his immediate prior messages which, apparently, Special Agent Taylor interpreted as reflecting questionable conduct related to the passing of counterfeit currency. Mr. Joseph then confessed to Special Agent Taylor and "admitted to his actions with the counterfeit money." (3/6/12 N.T. 32-33). He reconfirmed the oral confession in writing. (Govt. Ex. 3) (3/6/12 N.T. 59). This interviewing process concluded by 5:20 or 5:30 a.m. According to Special Agent Taylor, at no time did Mr. Joseph revoke his <u>Miranda</u> waiver. There is no evidence of threats, illegal intimidation, or tricks against Mr. Joseph by the law enforcement personnel at any time.

## **DISCUSSION**

Based upon the facts established at the suppression hearing as summarized above, Mr. Joseph's motion to suppress will be denied because all of the evidence he seeks to bar from trial was properly obtained.

The search of Mr. Joseph prior to his being transported to Southwest Detectives was proper

as a search incident to a lawful arrest and, as such, outside the warrant requirements of the Fourth Amendment. Arizona v. Gant, 556 U.S. 332, 338-339 (2009); United States v. Myers, 308 F.3d 251, 266 (3d Cir. 2002). As long as there is probable cause to make an arrest, the ensuing search is likely to be valid. Virginia v. Moore, 553 U.S. 164, 177 (2008). Here, Officer Umbrell, aided by Officer Morrison, had sufficient probable cause to arrest Mr. Joseph. Officer Umbrell received pertinent information from both the Atlantis security guard and the bartender who identified both the suspicious currency and Mr. Joseph as the patron who tendered it. Mr. Joseph acknowledged possessing and then tendering the bills. Mr. Joseph offered a suspicious passport as identification. Both Officers examined and found the currency to be at least questionable looking. Thus, the knowledge and information the officers had, together with their reasonable assessment of the circumstances then extant convinces the Court that they had probable cause to arrest Mr. Joseph. See United States v. Stubbs, 281 F.3d 109, 122 (3d. Cir. 2002).

Once Mr. Joseph was arrested, according to the sworn testimony of the officers, he was then searched[1] as would be standard procedure prior to his transport to the police station. During this search the additional counterfeit currency and his cell phone were recovered. Contrary to the arguments suggested by the defense, such a lawful search is not limited only for those arrestees who pose an outward threat of violence. See United States v. Dukes, 387 F. App'x 196, 200 (3d

---

[1] Although the testimonial evidence supports the conclusion that the search of Mr. Joseph followed his arrest, even if it immediately preceded a formal arrest in this circumstance a pre-arrest search would not have been improper given that the probable cause for the arrest existed and the elapsed time between the start of Officer Umbrell's inquiries and the arrest was roughly five minutes. Rawlings v. Kentucky, 448 U.S. 98, 110-111 (1980); United States v. Powell, 483 F.3d 836, 839 (D.C. Cir. 2007); United States v. Torres-Castro, 470 F.3d 992, 998 (10th Cir. 2006); United States v. Montgomery, 377 F.3d 582, 586 (6th Cir. 2004); United States v. Smith, 389 F.3d 944, 951 (9th Cir. 2004); United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997); United States v. Hernandez, 825 F.2d 846, 852 (5th Cir. 1987).

Cir. 2010) (identifying "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy" as permissible grounds to conduct a search incident to arrest) (citing Gant, 556 U.S. at 339). The evidence gained from this search will not be suppressed.

Likewise, the statements Mr. Joseph made to the law enforcement officers at the site of his arrest and then to Special Agent Taylor at the Southwest Detectives station are admissible. In the former setting Mr. Joseph admitted to possessing and passing the counterfeit currency at the night club, and in the latter setting he fully confessed to both. In both instances, Mr. Joseph's statements were knowingly and voluntarily given.

Miranda warnings are required in circumstances where a person being questioned finds himself both in a custodial setting and about to be the object of official interrogation. United States v. Jacobs, 431 F.3d 99, 104 (3d Cir. 2005); see also Yarborough v. Alvardo, 541 U.S. 652, 663-65 (2004). Thus, "general on-the-scene questioning" such as what Officers Umbrell and Morrison undertook vis à vis Mr. Joseph outside of the Atlantis night club customarily falls outside the rubic of an "interrogation" that triggers the invocation of Miranda. Miranda v. Arizona, 384 U.S. 436, 477 (1966). Cf. Berkemer v. McCarty, 468 U.S. 420, 439 (1984) (police may ask questions and request documents to establish identity and to confirm or dispel suspicions of criminal occurrences); United States v. Whitney, 350 F. App'x 627, 630 (3d Cir. 2009).

The challenge to the procedure followed by Special Agent Taylor when she spoke with Mr. Joseph likewise falls short of establishing a constitutional violation. On the contrary, the interview started with an oral and written admonition of Mr. Joseph concerning his Miranda rights. All of the evidence presented for the Court's consideration on this issue supports the Government's

contention that Mr. Joseph was aware of his rights, knowingly and voluntarily waived them, and then admitted commission of the acts attendant to the various elements of the crimes with which he was subsequently charged. See generally United States v. Valasquez, 885 F.2d 1076, 1084 (3d Cir. 1989). There is no operative similarity between the events in this case and the fact pattern in the case the defense cites, Missouri v. Seibert, 542 U.S. 600, 604-05 (2004), where an accused was questioned for almost three-quarters of an hour by an officer before that officer gave the Miranda warnings. As a result, the oral and written statements by Mr. Joseph to Special Agent Taylor are admissible at trial.

## CONCLUSION

For the foregoing reasons, Mr. Joseph's suppression motion is **DENIED**.

An appropriate **ORDER** follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER,     J.